STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-1231

STATE OF LOUISIANA

VERSUS

BEN R. BUSBY

************

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT,
PARISH OF ST. LANDRY, NO. 01-K-0097-C,
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and J. David Painter, Judges.

**CONVICTION AND SENTENCE VACATED AND SET ASIDE, AND CASE REMANDED FOR FURTHER PROCEEDINGS.**

Earl Taylor
District Attorney
Twenty-Seventh Judicial District
Alisa Ardoin Gothreaux
Assistant District Attorney
Post Office Drawer 1968
Opelousas, LA  70571
(337) 948-0551
COUNSEL FOR:
        State of Louisiana

J. Michael Small
Kathrine S. Williamson
Attorneys at Law
Post Office Box 1470
Alexandria, LA  71309
(318) 487-8963
COUNSEL FOR DEFENDANT/APPELLANT:
        Ben R. Busby

PETERS, J.

The defendant, Ben R. Busby, was involved in a November 9, 2000 automobile accident in which Rebecca Ann Watkins Bridges sustained fatal injuries. On April 24, 2001, a St. Landry Parish Grand Jury indicted the defendant for vehicular homicide, a violation of La.R.S. 14:32.1. After initially entering a not guilty plea to the charge, the defendant subsequently changed his plea to guilty as charged.[1] The trial court sentenced the defendant to serve six years at hard labor, with one year of the sentence to be served without the benefit of probation, parole, or suspension of sentence. In pleading guilty, the defendant reserved his right, pursuant to *State v. Crosby*, 338 So.2d 584 (La.1976), to appeal the trial court's denial of his motion to suppress the results of a chemical test for intoxication performed on a blood sample taken at Lafayette General Medical Center (Lafayette General) in Lafayette, Louisiana, on the night of the accident. For the following reasons, we reverse the trial court's denial of the defendant's motion to suppress, vacate the conviction and sentence, and remand the matter to the trial court for further proceedings consistent with this opinion.

## DISCUSSION OF THE RECORD

The accident giving rise to this criminal prosecution occurred in St. Landry Parish at approximately 3:45 p.m. on November 9, 2000, when a vehicle driven by the defendant collided with a vehicle driven by Ms. Bridges. Both individuals sustained serious personal injuries in the accident and were transported to Doctor's Hospital in Opelousas, Louisiana, where Ms. Bridges died the next day.

Sometime during the evening of November 9, the defendant was transported to Lafayette General for further treatment of his injuries. Almost eight hours after the

---

[1] The history of this litigation involves numerous other resolved pretrial issues which have no direct bearing on the issue before this court and will not be discussed.

accident, medical personnel at Lafayette General obtained a blood sample from the defendant and submitted it for testing to establish his blood alcohol concentration. The test results, when subjected to retrograde extrapolation, indicated that the defendant had an estimated blood alcohol concentration somewhere between 0.139 to 0.356 grams of alcohol per one hundred cubic centimeters of blood at 3:45 p.m. on November 9, 2000.

On October 23, 2002, the defendant filed the motion to suppress now at issue before this court, seeking to have the results of the Lafayette General testing excluded from evidence at trial. At a February 18, 2003 hearing on the defendant's motion, the state stipulated that Lafayette General did not apply the rules and regulations of the Louisiana Department of Public Safety and Corrections in drawing and testing the defendant's blood and that the blood was drawn for medical purposes and not pursuant to a request by the state. This stipulation constituted the only evidence presented at the hearing. The trial court took the matter under advisement and, on February 20, 2003, issued written reasons denying the motion to suppress. The defendant sought review of this ruling by a writ application to this court. In an unpublished writ opinion, this court granted the writ application, using the following language:

> WRIT GRANTED AND MADE PEREMPTORY: The trial court erred in denying the Defendant's Motion to Suppress the defendant's blood alcohol test results to show a presumption of intoxication. However, the results *may* be admissible, not as a presumption of intoxication, but as other evidence of intoxication if done in compliance with *State v. Honeyman*, 560 So.2d 825 (La.1990).

*State v. Busby*, 03-0434 (La.App. 3 Cir. 5/30/03).

The admissibility issue was not again addressed until immediately before the beginning of trial on July 12, 2004. At that time, the trial court held a hearing to

2

determine whether the Lafayette General test results met the test for admissibility set forth by the supreme court in *State v. Honeyman*, 560 So.2d 825 (La.1990). At the conclusion of that hearing, the trial court ruled that the state would be able to introduce the Lafayette General test results. Based on that ruling, and after objecting thereto, the defendant entered his guilty plea pursuant to *Crosby*, 338 So.2d 584. Thereafter, he perfected this appeal, asserting in his sole assignment of error that the trial court erred in holding that the Lafayette General test results were admissible against him.

**OPINION**

The defendant pled guilty to vehicular homicide, a violation of La.R.S. 14:32.1, which provides in pertinent part as follows:

> A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle . . . whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exists:
>
> (1) The operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.
>
> (2) The operator's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.

The state acknowledges that the chemical test involved in this prosecution was not administered under the provisions of La.R.S. 32:662, and our prior decision granting the defendant's writ application requires that the state pursue this prosecution under La.R.S. 14:32.1(A)(2).

As pointed out in our ruling on the defendant's writ application, the Lafayette General test results may still be admissible in the defendant's prosecution, but only

3

as evidence on the issue of the defendant's intoxication at the time of the accident. *Honeyman*, 560 So.2d 825. In *Honeyman*, the supreme court established the standard to be used in determining whether blood alcohol tests are admissible in situations where the statutory presumption of intoxication is not applicable:

> When the state does not rely on the statutory presumption of intoxication, it may use all admissible evidence to prove that a defendant is guilty of vehicular homicide. We stated in [*State v.*] *McElroy*, 553 So.2d [456] at 458 [(La.1989)]:
>
> > [W]ithout the benefit of the statutory presumption of intoxication, the state may nonetheless endeavor to prove that a defendant was guilty of driving while intoxicated, and, in the process, attempt to use all admissible evidence, including the hospital record, the testimony of the technologist performing the blood alcohol test, and expert testimony concerning the likely effect upon an individual of a given blood alcohol level.
>
> In order for the results of a blood alcohol test to be admissible, the state must prove that the reliability of the test satisfies due process and fairness. We stated in *McElroy*, 553 So.2d at 458 n. 1:
>
> > Should there be no predominant evidence of "careful adherence to strict procedures in administering intoxication tests," *State v. Jones*, [316 So.2d 100, 105 (La.1975)], or in the event that a defendant takes issue with the qualifications of a technician, the quality of the testing machine, or the maintenance of the equipment, and so forth, the court, in the interest of due process and fairness, may well be entitled to bar the evidence.

*Id.* at 829.

The issue to be decided in this appeal is whether the Lafayette General test results meet the due process and fairness test set forth in *Honeyman.* In arguing that the test results do not meet the *Honeyman* test, the defendant takes issue with the qualifications of the person who drew the blood; the drawing, handling, and transporting of the blood to the laboratory; the qualifications of the technologist who

4

tested the blood; the equipment used in testing the blood; the blood testing procedure; and the conclusions of the toxicologist who promulgated the final results.

*Lafayette General Protocol*

Dr. Donald W. West, the medical director of Lafayette General's testing laboratory and an expert clinical pathologist, testified at the July 12, 2004 hearing that, on November 9, 2000, the hospital had in place a specific protocol for determining the blood alcohol concentration of a patient.[2] The purpose of having a protocol is to be assured that the final test result has not been contaminated by someone mishandling the blood sample.

According to Dr. West, when a blood sample is needed for testing to determine a patient's blood alcohol concentration, a phlebotomist or nurse is responsible for taking the sample from the patient. The protocol specifically requires that the individual taking the sample use Betadine, not alcohol, to prep the site where the sample is to be taken to avoid contaminating the sample. He explained that, if used, alcohol could adversely affect the test results. Once the sample is obtained, the phlebotomist or nurse who takes the sample is responsible for properly marking it for identification and immediately transporting it to the hospital's laboratory.

Dr. West further explained that once the sample is delivered to the laboratory, a medical technologist bears the responsibility of testing the sample and recording the results. The medical technologist places the sample in a centrifuge to separate its solid and liquid elements. Thereafter, the serum portion of the separated sample is placed in a chemical analyzer which, based on the information it derives concerning

---

[2]The state offered no written documents describing the protocol and relied totally on the witnesses presented to establish its existence and contents.

the patient involved and the testing requirements, performs the appropriate tests and records the results.

According to Dr. West, the laboratory used a Vitros 950 chemical analyzer in November of 2000. This particular machine uses an enzyme methodology for measuring the alcohol concentration. Dr. West testified that the enzyme methodology was the most common methodology used in hospitals for routine medical testing for alcohol in blood samples in 2000 and that the Vitros 950 was one of the most reliable and accurate machines available at that time. To insure the accuracy of the Vitros 950, the laboratory required that it be subject to a proficiency test every six months and that it be calibrated daily. The particular machine involved in this litigation had been last subject to a proficiency test by an outside agency on September 11, 2000. According to Dr. West, the results of that outside test were "[a]cceptable."

Donna Eugene, a phlebotomist employed by Lafayette General, also testified at the July 12, 2004 hearing concerning the hospital's protocol. She basically repeated Dr. West's testimony concerning the collection of the sample and delivery to the laboratory. According to Ms. Eugene, included as a part of the identifying information on the sample are the initials of the person drawing the blood. Her standard procedure was to obtain the sample, properly mark the vial containing the sample with the appropriate information, initial the vial, and take it immediately to the hospital laboratory for testing. She further testified that she normally makes no notation of her blood-drawing activity in the patient's medical chart. Thus, the only physical evidence of her involvement in a particular testing process would be the presence of her initials on the vial containing the blood sample.

Joseph Pham, a medical technologist employed by Lafayette General, testified that one of his duties in the hospital laboratory is to analyze blood samples submitted to determine blood-alcohol content. In explaining the procedure used in the laboratory, Mr. Pham stated that when he receives a specimen for testing, he checks the name, the hospital number, and the donor information to ascertain that the "sample is appropriate and intact." He testified that he then places the sample in the centrifuge and after the solids are separated from the liquids, he places the serum in the Vitros 950 analyzer. The 950 analyzer then reads the bar code on the sample and performs the appropriate test.

Dr. Felix Adatsi, a Lansing, Michigan toxicologist and the individual who performed the retrograde analysis of Lafayette General's test results, also testified for the state at the July 12, 2004 hearing. Dr. Adatsi agreed with Dr. West concerning the acceptance by the scientific and medical communities of the accuracy and appropriateness of the use of enzyme methodology and the Vitros 950 analyzer in determining blood alcohol concentration in an individual. He also agreed with Dr. West that enzyme methodology is the method used almost exclusively by hospitals.

### Application of Lafayette General's Protocol to this Case

Dr. West was not present at Lafayette General when the defendant's blood was drawn and tested. Therefore, he could only describe the hospital protocol applied to the procedure and evaluate the defendant's hospital record to see to what extent that record reflected that the protocol was followed. He pointed out that the hospital record contained the notation, "Serum drawn at 11:26 pm," and, from that notation, he concluded that the sample was drawn from the defendant at that time.

Mr. Pham testified that he worked on the evening of November 9, 2000, and performed the analysis on the defendant's blood sample. In doing so, he followed the procedure set forth in the laboratory's operating manual. He placed the sample in the centrifuge to separate the solids from the liquid and then placed the serum in the Vitros 950 analyzer which read the bar code on the sample and performed the appropriate test. According to Mr. Pham, he ran only one test on the defendant's sample.

Thereafter, the results were provided to Dr. Adatsi, who performed the retrograde extrapolation calculations. Dr. Adatsi testified that after adjusting for the fact that Lafayette General tested serum rather than whole blood, and after adjusting for the fact that individuals have varying alcohol absorption and elimination rates, he performed the retrograde extrapolation to establish the defendant's blood alcohol concentration at the time of the accident. Applying these adjustments to the Lafayette General test results, Dr. Adatsi concluded that the defendant had an estimated blood alcohol concentration of between 0.139 and 0.356 grams of alcohol per one hundred cubic centimeters of blood at 3:45 p.m. on November 9, 2000, with the average ranging from 0.193 to 0.195.

### *Analysis of the Defendant's Challenges to the Test Results*

In challenging the various aspects of Lafayette General's protocol and testing procedure, the defendant compares the step-by-step record of these proceedings to that described in *Honeyman*, 560 So.2d 825. He argues that in comparison, Lafayette General's protocol and performance is so deficient that it violates the due process and fairness standard set forth in *Honeyman.*

8

In summarizing the evidence presented in *Honeyman*, the supreme court stated the following:

> In the instant case, the technician who drew defendant's blood was trained, certified, and experienced. He drew the blood within three hours of the accident. The kit he used to draw the blood contained a preservative which inhibits any ethanol (alcohol) production in the tubes used to store the blood. He gave the blood to the chemist the day after the accident. The next day, the chemist performed the blood analysis. She was required to follow and did follow the crime lab's procedures, which exceeded the requirements of Department of Public Safety regulations. La.Admin.Code tit. 55:I, §§ 551-553 (1987); *see also* 14 La.Reg. 360 (1988) (to be codified at La.Admin.Code tit. 55:I, §§ 551-563). She was trained, took frequent proficiency tests, and was certified as a blood alcohol analyst by the Louisiana Department of Public Safety. She routinely inspected and maintained the gas chromatograph. Prior to analyzing defendant's blood sample, the chemist calibrated the machine by analyzing four samples of known blood alcohol content. The calibration procedure spot checks the chemicals used in the calibration because the results of the samples confirm each other. She analyzed defendant's blood sample in duplicate. The results of the gas chromatograph were shown to be reliable by proficiency tests regularly performed on samples sent from the University of Tennessee Toxicology Lab and crime labs in Monroe and Alexandria. Under the circumstances, we find that the reliability of the blood alcohol test satisfies due process and fairness.

*Id.* at 829.

In the matter before us, Ms. Eugene was the only person presented as qualified to draw the defendant's blood. She had been employed by Lafayette General as a phlebotomist for twelve years and was so employed on November 9, 2000. According to Ms. Eugene, she received her training in the United States Army Reserve, but was not certified or licensed in her field. Mr. Pham obtained a bachelor's degree in medical technology in 1997 and began working for Lafayette General thereafter. The record contains no evidence that he took proficiency tests to hone his skills or that he was certified by the Louisiana Department of Public Safety. While there is evidence that some form of calibration of the laboratory equipment

took place daily, the record contains no evidence of the extensive checking performed by the chemist in *Honeyman*. Additionally, Mr. Pham analyzed the defendant's sample only once as opposed to twice in *Honeyman.*

Thus, it is clear that the evidence before us is significantly less than that presented in *Honeyman*. However, we do not find that the supreme court intended to suggest that each testing procedure must meet or exceed the evidence presented by the state in that case. Instead, the supreme court merely established that a due process and fairness standard is to be applied to each individual factual situation. Furthermore, we need not evaluate each and every protocol step in the case before us to determine whether the overall protocol satisfies due process and fairness standards because we find that the state failed to establish that Lafayette General followed its own protocol in testing the defendant's blood. Specifically, there is nothing in the record to establish who took the defendant's blood sample, or if it was taken according to Lafayette General's established protocol.

Dr. West was not at the hospital on the evening of November 9, 2000, and could not identify the person who took the sample from the defendant by examing the medical records. Ms. Eugene described how she would have taken the sample had she been the person to do so, but never testified that she drew the blood in this case, or that she was even working at the hospital on the evening of November 9, 2000. Mr. Pham could not recall who delivered the blood sample to him. Of significance is Ms. Eugene's testimony that she did not normally make a medical chart entry when she took a blood sample from a patient. Thus, the only evidence of her activity would have been the presence of her initials on the vial used to transfer the blood sample to

10

the hospital laboratory. In this case, that vial no longer exists so there is no evidence of her involvement, if any, in the defendant's case.

The identity and qualifications of the person drawing the blood is critical in this matter because both Dr. West and Ms. Eugene testified concerning the importance of not using alcohol to prep the site of the blood sample extraction. Thus, we have an acceptable protocol with regard to the drawing of the blood, but have no evidence that the protocol was followed in this particular instance. Without evidence of this critical part of the testing process, one cannot say that the test results are so reliable as to satisfy due process and fairness. Therefore, we find that the trial court erred in ruling that the test results were admissible, and it therefore becomes unnecessary to address the defendant's other arguments.

## DISPOSITION

For the foregoing reasons, we reverse the trial court's denial of the defendant's motion to suppress the results of the blood alcohol concentration test performed at Lafayette General Medical Center and, in doing so, vacate the defendant's conviction and sentence. We remand this matter to the trial court for further proceedings consistent with this opinion.

**CONVICTION AND SENTENCE VACATED AND SET ASIDE, AND CASE REMANDED FOR FURTHER PROCEEDINGS.**