McDonald, j.
 

 |2The defendant, Guy Joseph Dickinson, was charged by bill of information with one count of vehicular homicide, a violation of La. R.S. 14:32.1, and pled not guilty. Following a jury trial, he was found guilty as charged. The defendant moved for post-verdict judgment of acquittal, but the motion was denied. He was sentenced to seven years without hard labor, with one year without the benefit of probation, parole, or suspension of sentence. The rest of the sentence was suspended, and defendant was given five years probation. The court also ordered that he attend a victims’ impact panel and substance abuse and driver improvement programs. The defendant now appeals, contending that the trial court erred in allowing the State to introduce the results of a blood-alcohol test
 
 *181
 
 conducted at Our Lady of the Lake Regional Medical Center (Our Lady of the Lake) on the night of the accident and that the jury erred in finding him guilty because the State introduced no evidence to prove that he was the proximate or direct cause of the death of the victim. The State also appeals, contending that the trial court imposed an illegally lenient sentence. We affirm the conviction and sentence.
 

 FACTS
 

 On October 14, 2005, at approximately 11:15 p.m., the victim, Stacy Link, was killed in a car accident. She had been a passenger along with her fiance, Christopher Wayne Mouille, and Scott Pourciau in a white Ford Excursion driven by the defendant. The accident occurred on a dry blacktop road in clear weather.
 

 According to Mouille, at approximately 5:00 p.m. or 6:00 p.m. on the day of the accident, he and the defendant started drinking beer from an ice chest containing six to twelve cans of beer. After picking up Pourciau, the men went to Chris Wat-ley’s house. Watley provided beer and jello shots at his house, and while 13Mouille indicated that he and the defendant drank at Watley’s house, he was unaware of how much the defendant drank there. The defendant, Mouille and Pourciau then went to Superior Grill to pick up the victim. They arrived between 9:00 p.m. and 10:00 p.m. and each drank a Margarita before leaving. The fatal accident occurred as the group of friends drove on Florida Boulevard towards Juban Road to take Pour-ciau home.
 

 Louisiana State Police Trooper Jason Shavers responded to the accident. The Nissan Sentra involved in the accident was on the westbound lane of U.S. Hwy. 190, facing east. The Ford Excursion was in a ditch on the north side of U.S. Hwy. 190, resting on its passenger’s side. Based on the physical evidence, accounts of the occupants of the vehicles, and the account of an independent witness, Trooper Shavers determined that the collision had occurred after the Nissan Sentra made a left turn out of a private driveway, attempting to travel west on U.S. Hwy. 190 and was struck in the rear quarter panel by the eastbound Ford Excursion. The Ford Excursion then continued eastbound, yawed
 
 [1]
 
 off the roadway to the left, struck a culvert, vaulted over a private driveway, landed on its driver’s side, and rolled onto its passenger’s side.
 

 Trooper Shavers measured a 105-foot yaw mark from the right front tire of the Ford Excursion. He saw no indication of any effort to steer to avoid the accident or emergency braking or skid marks indicating driver reaction to the collision.
 

 l4When Trooper Shavers spoke to the defendant on October 15, 2005, at approximately 4:00 a.m., he noticed a faint odor of alcoholic beverages coming from the defendant’s facial area and breath. Trooper Shavers performed the horizontal gaze nystagmus test on the defendant and detected six clues indicating that the defendant was under the influence of alcoholic beverages.
 

 Trooper Shavers indicated, after being advised of his rights, the defendant admitted he was under the influence of some type of alcoholic beverage at the time of the accident. Trooper Shavers conceded, however, that the defendant answered negatively to the question on the interview questionnaire, “Did you feel the effects of
 
 *182
 
 alcoholic beverage or drugs when you were stopped.” The defendant told Trooper Shavers that he (the defendant) had been drinking all day, specifically four or five beers, prior to going to Superior Grill. The defendant claimed he tried to stop after the Nissan Sentra pulled out in front of him, but could not remember if he struck the vehicle because he blacked out. Trooper Shavers arrested the defendant for driving while intoxicated and advised him of his rights relating to chemical testing. The defendant stated he understood and voluntarily submitted a blood sample. A registered nurse drew the defendant’s blood in the presence of Trooper Shavers at 4:03 a.m. Trooper Shavers transported the blood sample at to the evidence custodian for submittal to the Louisiana State Police Crime Lab. Testing on the sample-revealed a blood-alcohol concentration of 0.08 grams percent.
 

 The defendant’s blood was also tested in connection with treatment he received at Our Lady of the Lake. Blood-alcohol analysis on his blood on October 15, 2005, at 1:21 a.m., revealed a blood-serum-alcohol level of 149.2 mg/dl or .135 grams of alcohol per one hundred cubic centimeters of blood.
 

 Jimmy Barnhill, Assistant Director for the North Louisiana Criminalistics Laboratory, was accepted as an expert in the field of the effects of alcohol on the | (¡human body and blood-alcohol determinations. He indicated that as a person’s blood-alcohol level rose over .05, his vision would be affected in three ways. The person might begin to see double or suffer from diplopia. Further, the time required for the person to recover from the dazzling effect of a bright light would be lengthened. Additionally, the person’s ability to see peripherally would be diminished. Barnhill also indicated that the person’s reaction time would be slower and their ability to make quick decisions would be impaired.
 

 Barnhill also testified that assuming that there was not a bizarre drinking situation, and based on the two blood-alcohol test results, and 2.75 hours elapsed time between the two results, his opinion was that the defendant’s blood-alcohol level at the time of the accident was “somewhere around .15[.j” Barnhill stated, “I think I actually calculated it three decimal places, and it turned out to be .155.”
 

 Aimee Breaux, the driver of the Nissan Sentra, submitted to a breath test on the intoxilyzer machine, and the machine indicated she had no alcohol in her system.
 

 Donald McLean, Jr., a passenger in the Nissan Sentra, testified that the collision felt like he and the other occupants of the Nissan Sentra had hit a pothole. Immediately after the collision, McLean saw a car swerve all over the road, veer off the road, come back onto the road, go into a ditch, presumably hit a culvert, and flip end over end. According to McLean, the posted speed limit in the area was forty-five miles per hour.
 

 SUFFICIENCY OF THE EVIDENCE
 

 In assignment of error number two, the defendant argues there was insufficient evidence to support the verdict against him because the evidence at trial indicated that he was operating a white Ford Excursion in the eastbound lane of U.S. Hwy. 190 when a black Nissan Sentra failed to yield as it exited the parking lot of a closed business and pulled into the eastbound lane where the accident occurred. In | fiassignment of error number three, for the same reasons set forth in support of assignment of error number two, the defendant argues the trial court erred in denying the motion for post-verdict judgment of acquittal.
 

 
 *183
 
 The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant’s identity as the perpetrator of that crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana’s circumstantial evidence test, which states in part, “assuming every fact to be proved that the evidence tends to prove,” in order to convict, every reasonable hypothesis of innocence is excluded.
 
 State v. Wright,
 
 98-0601, p. 2 (La.App. 1st Cir.2/19/99), 730 So.2d 485, 486,
 
 writs denied,
 
 99-0802 (La.10/29/99), 748 So.2d 1157, 2000-0895 (La.11/17/00), 773 So.2d 732 (quoting La.R.S. 15:438).
 

 When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.
 
 Wright,
 
 98-0601 at p. 3, 730 So.2d at 487.
 

 As pertinent here, vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, whether or not the offender has the intent to cause death or great bodily harm, when the operator’s blood-alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood or the operator is under the influence of |7alcoholic beverages. La. R.S. 14:32.1(A)(1), (2).
 

 Under the vehicular homicide statute, the State, in order to convict, must prove that an offender’s unlawful blood-alcohol concentration combined with his operation of a vehicle to cause the death of a human being. The evident purpose of the statute is to curb traffic fatalities caused by the consumption of alcohol. It is not aimed at persons involved in vehicular fatalities whose alcohol consumption does not cause, but merely coincides with, such an accident. The statute should be construed to require proof of a causal relationship between an operator’s unlawful blood-alcohol concentration and the death of the victim in order to convict.
 
 State v. Taylor,
 
 463 So.2d 1274, 1275 (La.1985).
 

 The defendant’s reliance upon
 
 State v. Archer,
 
 619 So.2d 1071 (La.App. 1st Cir.),
 
 writ denied,
 
 626 So.2d 1178 (La.1993), is misplaced. In
 
 Archer,
 
 this court reversed a conviction for vehicular homicide, holding that the State failed to sufficiently establish that the defendant’s blood-alcohol concentration combined with the operation of his vehicle and resulted in the victim’s death. We found that the hypothesis that the driver of the other vehicle involved in the accident was speeding and ran a red light was sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 Archer,
 
 619 So.2d at 1075. We noted that the defendant’s statement at the scene that he had a green left-turn arrow was neither disproved nor disputed.
 
 Archer,
 
 619 So.2d at 1074. We also noted testimony from a passenger in the other vehicle that the driver and passengers in the other vehicle had been celebrating the birthday of one of the passengers prior to the accident.
 
 Archer,
 
 619 So.2d at 1075. The men had purchased a case of beer and stored it in a cooler in the vehicle.
 
 Id.
 
 They had also
 
 *184
 
 been drinking for three to four hours prior to the accident.
 
 Id.
 
 Additionally, we noted expert opinion that the driver of the other vehicle was driving at least five to |sten miles over the speed limit.
 
 Id.
 

 In the instant case, the testimony credited by the jury indicated that the defendant, and not the driver of the Nissan Sentra, had been drinking for hours prior to the collision with the Nissan Sentra. Additionally, physical evidence at the scene indicated the defendant failed to react to the collision.
 

 After a thorough review of the record, we are convinced the evidence presented in this case, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of vehicular homicide and the defendant’s identity as the perpetrator of that offense against the victim. The verdict rendered against the defendant indicates the jury accepted the testimony of the State’s witnesses which established that the victim’s death was the result of the defendant’s allowing the Ford Excursion to veer off the road after striking the Nissan Sentra, and that the defendant failed to stop because he was under the influence of alcoholic beverages. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness.
 
 State v. Johnson,
 
 99-0385, p. 9 (La.App. 1st Cir.11/5/99), 745 So.2d 217, 223,
 
 writ denied,
 
 2000-0829 (La.11/13/00), 774 So.2d 971. On appeal, this court will not assess the credibility of witnesses or re weigh the evidence to overturn a fact finder’s determination of guilt.
 
 State v. Glynn,
 
 94-0332, p. 32 (La.App. 1st Cir.4/7/95), 653 So.2d 1288, 1310,
 
 writ denied,
 
 95-1153 (La.10/6/95), 661 So.2d 464. Further, in reviewing the evidence, we cannot say that the jury’s determination was irrational under the facts and circumstances presented to them.
 
 See State v. Ordodi,
 
 2006-0207, p. 14 (La.11/29/06), 946 So.2d 654, 662.
 

 Additionally, the verdict rendered against the defendant indicates that the jury rejected the defense theory that the driver of the Nissan Sentra was the only direct or proximate cause of the death of the victim. The damage to the Nissan Sentra was to | ¡)the rear of the vehicle, and there was no evidence that the Nissan Sentra knocked the much larger and heavier Ford Excursion off the road. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.
 
 See State v. Moten,
 
 510 So.2d 55, 61 (La.App. 1st Cir.),
 
 writ denied,
 
 514 So.2d 126 (La.1987). No such hypothesis exists in the instant case.
 

 These assignments of error are without merit.
 

 ADMISSIBILITY OF BLOOD-ALCOHOL TEST RESULTS
 

 In assignment of error number one, the defendant argues that the results of the blood-alcohol test on the blood drawn for treatment purposes at Our Lady of the Lake did not meet the admissibility requirements of
 
 State v. Honeyman,
 
 560 So.2d 825 (La.1990).
 

 When the State does not rely on the statutory presumption of intoxication, it may use all admissible evidence including the hospital record, the testimony of the technologist performing the blood-alcohol test, and expert testimony concerning the likely effect upon an individual of a given blood-alcohol level, to prove that a defendant is guilty of vehicular homicide.
 
 *185
 
 In order for the results of a blood-alcohol test to be admissible, the State must prove that the reliability of the test satisfies due process and fairness. Should there be no predominant evidence of careful adherence to strict procedures in administering intoxication tests, or in the event that a defendant takes issue with the qualifications of a technician, the quality of the testing machine, or the maintenance of the equipment, and so forth, the court, in the interest of due process and fairness, may well be entitled to bar the evidence.
 
 Honey-man,
 
 560 So.2d at 829.
 

 l1(VAt trial, the defendant challenged the admissibility of his medical records, which included blood-alcohol analysis on his blood on October 15, 2005, at 1:21 a.m., indicating a blood-serum-alcohol level of 149.2 mg/dl or .135 grams of alcohol per one hundred cubic centimeters of blood. The defendant challenged the reliability of the machine used to test his blood sample. He questioned whether Our Lady of the Lake Medical Technologist Millicent Chu-kuwemeka had conducted the analysis. He claimed Registered Nurse Marjorie Firestone had used an alcohol swab to clean the site before drawing his blood. He questioned whether quality control had been performed on the testing machine prior to it being used to test his blood sample. He also argued that Chukuweme-ka had indicated that deionized water had been used to clean the testing machine, but had not indicated how the water was produced, where it was produced, or who had produced the water. The State argued the defendant’s arguments went to the weight of the evidence, rather than to its admissibility. The State further argued that it had shown the protocols according to
 
 Honeyman,
 
 and had produced the records as per the custodian of the records. The court allowed the records to come into evidence, and the defendant assigned error to the court’s ruling.
 

 Dr. Robert Muhumuza testified he had been a licensed physician in Louisiana for approximately eleven years, in Texas for approximately fourteen years, and in Uganda for approximately eighteen years. He was certified in internal medicine and gastroenterology. Dr. Muhumuza practiced emergency medicine at Our Lady of the Lake, taught residents at Earl K. Long, and had a private practice in Gonzales. He treated the defendant at Our Lady of the Lake on October 14, 2005— October 15, 2005. Dr. Muhumuza ordered radiological studies of the defendant and blood work. He indicated he did not believe that swabbing a patient with alcohol prior to drawing their blood would affect the results of the Inblood-alcohol level in the blood. He indicated that the swabbed area would normally be allowed to dry before a needle was introduced, and the alcohol swabs used were prepacked and contained very little alcohol. Dr. Muhu-muza also noted that the human body had ten liters of fluid so any alcohol introduced would be like adding a little alcohol to a big pool of water.
 

 Registered Nurse Marjorie Firestone testified that, on October 15, 2005, she drew the defendant’s blood at Our Lady of the Lake on the order of Dr. Robert Mu-humuza. She had a B.S. in nursing, had been licensed to practice nursing in Louisiana for twenty and one-half years, and was certified in trauma nursing and advanced cardiac life support. She indicated her procedure for taking blood involved checking the doctor’s orders; checking the patient’s name by their armband; drawing the blood; placing the blood into tubes; placing her initials, the time the blood was drawn, the patient’s date of birth and the patent’s hospital number on the tubes; placing the tubes into a bag; and sending the bag to the lab by placing it into a pneumatic tube system. Nurse Firestone
 
 *186
 
 indicated she had personally placed the required information on the tubes after drawing the defendant’s blood and had sent the tubes to the lab. She indicated controls were in place to prevent tubes from being mixed up and she was unaware of there ever having been a mix-up with tubes. She indicated she could not recall whether she used an alcohol prep or a betadine prep in connection with drawing the defendant’s blood.
 

 Millicent Chukuwemeka testified she had been a medical technologist for eight to nine years. She had graduated from LSU Medical Center in 1998 with a B.S. She was certified with the American Association for Clinical Pathologists. She was also licensed and took at least twelve hours of education every year in order to renew her license. She performed tests on blood samples all day long in [ 1Pher job at Our Lady of the Lake. She used an Architect 8000 series machine to determine blood-alcohol concentrations. The lab at Our Lady of the Lake had controls in place which were tested and upgraded to ensure that they were followed. Prior to determining blood-alcohol concentrations in a sample, Chukuwemeka ran the sample against a known standard to check the accuracy of the result.
 

 Blood samples were delivered to the lab by a chute system. After blood was drawn and placed in a tube, it would be labeled with a bar code which identified the patient name, I.D. Number, and medical records number. Then it would be sealed in a biohazard bag, and this bag would be locked into another container and placed into the chute system. After receiving a sample for testing, while the sample was still in a sealed tube, Chukuwemeka would “spin it down” to separate the blood from the serum, and then test the serum in a machine which would automatically transfer results to a computer which would display the results. Protocols to prevent contamination included wearing gloves, making sure every tube was by itself, placing the tubes in a particular section of a rack, making sure the instrument was well maintained, and keeping the records updated. Chukuwemeka indicated if a sample was contaminated, the test results would indicate contamination and the test would be repeated. She indicated quality control was performed on the machine once per every eight-hour shift and all quality controls worked for all samples tested on the day that the defendant’s blood sample was tested. Quality control was performed on the Architect 8000 machine between 12:00 a.m. and 2:00 a.m. on the night the defendant’s blood sample was tested. The State introduced the quality control protocols for the Architect 8000 machine into evidence.
 

 |1sThe Architect 8000 machine used deionized water to clean its different probes and also to flush the probes. Chu-kuwemeka indicated she did not know the source of the deionized water other than it came from a mechanism on the wall. She also did not specifically remember the sample concerning the defendant, but indicated, “When I checked the record, my signature was there.”
 

 The trial court did not abuse its discretion in allowing the results of the blood-alcohol test performed on the defendant’s blood at Our Lady of the Lake to come into evidence. The State proved the reliability of the test satisfied due process and fairness.
 

 This assignment of error is without merit.
 

 ILLEGALLY LENIENT SENTENCE
 

 The State argues the sentence imposed was illegally lenient because the trial court ignored all the testimony and evidence supporting the fact that the de
 
 *187
 
 fendant’s blood alcohol was above .15 grams percent.
 

 An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. La. C.Cr.P. art. 882(A). A sentence may be reviewed as to its legality on the application of the defendant or of the State in an appealable case by appeal. La. C.Cr.P. art. 882(B)(1).
 

 Whoever commits the crime of vehicular homicide shall be fined not less than two thousand dollars nor more than fifteen thousand dollars and shall be imprisoned with or without hard labor for not less than two years nor more than thirty years. At least one year of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. If the operators blood-alcohol concentration is 0.15 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood, then at least five years of the sentence of 114imprisonment shall be imposed without benefit of probation parole, or suspension of sentence. La. R.S. 14:32.1(B) (prior to amendment by 2006 La. Acts No. 294, § 1).
 

 In sentencing the defendant, the court stated it was imposing the sentence “under the 0.08” because it “[did] not believe that that (presumably the more severe penalty when the operator’s blood-alcohol level is 0.15 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood) was fully proven at that time.” The State gave notice of intent to appeal the leniency of the sentence.
 

 The sentencing transcript reflects that rather than ignore the evidence, the court carefully considered the evidence, but determined that sentencing under the stricter penalty provision of La. R.S. 14:32.1(B) was not warranted in this case. There was no abuse of discretion.
 

 This assignment of error is without merit.
 

 CONVICTION AND SENTENCE AFFIRMED.
 

 PETTIGREW, J., concurs.
 

 [1]
 

 . Trooper Shavers indicated a vehicle left a "yaw mark" when it was going sideways, rotating and slipping.