# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-1571

**STATE OF LOUISIANA**

**VERSUS**

**SHERRY S. BAILEY**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 03-1177
HONORABLE KATHY A. JOHNSON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**CONVICTION REVERSED AND SET ASIDE;
APPELLANT ACQUITTED.**

Amy, J., dissents and assigns written reasons.

Hon. John Frederick Johnson
District Attorney, 7th JDC
Ronnie Owen McMillin
Assistant District Attorney
4001 Carter St., Suite 9
Vidalia, La 71373
(318) 336-7121
Counsel for State-Appellee:
  State of Louisiana

G. Paul Marx
Attorney at Law
P. O. Box 82389
Lafayette, LA 70598-2389
(337) 237-2537
Counsel for Defendant-Appellant:
  Sherry S. Bailey

**PICKETT, Judge.**

## FACTS

On May 30, 2003, shortly after 9:00 p.m., an automobile driven by the defendant struck an automobile driven by Lillie C. Ingram on Highway 84 in Concordia Parish. According to witnesses, Ms. Ingram's car was stopped on the highway in a left-hand lane proximate to a store when it was struck from the rear by the defendant's car. The responding officer interviewed the defendant. Following that interview, and based on his observations and field sobriety tests, the officer arrested the defendant for driving while intoxicated. Ms. Ingram was removed from her vehicle and placed in an ambulance, where she was pronounced dead by the coroner at 10:05 p.m.

On August 6, 2003, the defendant, Sherry Bailey, was charged with vehicular homicide, a violation of La.R.S. 14:32.1. On May 3, 2004, the bill of information was amended to include the allegation that at the time of the accident which caused the victim's death, the defendant was under the influence of alcohol or a combination of drugs and alcohol and that her blood alcohol concentration exceeded 0.08 percent.

On May 10, 2004, and following the trial, the jury found the defendant guilty as charged. On August 18, the trial court sentenced the defendant to six years imprisonment at hard labor, a fine of $2000 and court costs. The trial court further specified that the first year of the sentence was to be served without benefit of probation, parole or suspension of sentence and ordered the defendant to attend a substance abuse program.

1

On August 30, 2004, a judgment of felony conviction was entered, and on September 22, 2004, a motion for appeal was filed. The defendant now appeals her conviction and alleges three assignments of error.

**DISCUSSION**

In her second assignment of error, the defendant argues that the evidence was insufficient to sustain a conviction because the state failed to prove that the accident was caused by the defendant, and not by the dangerous position of the victim's car immediately prior to the impact.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The elements of the crime at issue are set forth in La.R.S. 14:32.1, which states, in pertinent part:

> A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance, whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exists:

2

(1) The operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.

(2) The operator's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.

As another circuit has explained:

In *State v. Taylor*, 463 So.2d 1274, 1275 (La.1985), the Louisiana Supreme Court concluded that, under the vehicular homicide statute, "the state . . . must prove that an offender's unlawful blood alcohol concentration combined with his operation of a vehicle to cause the death of a human being." *See also State v. Ritchie*, 590 So.2d 1139, 1149 (La.1991) (on rehearing). It is insufficient for the state to prove merely that the alcohol consumption "coincides" with the accident. *Taylor*, 463 So.2d at 1275. The vehicular homicide statute does not impose criminal liability based solely on the coincidental fact that the fatal accident occurred (without fault on the part of the accused) while the accused was operating a vehicle under the influence of alcohol. *Ritchie*, 590 So.2d at 1149. *See State v. Archer*, 619 So.2d 1071, 1074 (La.App. 1st Cir.), *writ denied*, 626 So.2d 1178 (La.1993). Causation is a question of fact which should be considered in light of the totality of circumstances surrounding the ultimate harm and its relation to the actor's conduct. *State v. Kalathakis*, 563 So.2d 228, 231 (La.1990).

*State v. Trahan*, p. 11 (La.App. 1 Cir. 5/20/94), 637 So.2d 694, 701.

In her brief to this court, the defendant argues that the victim was stopped in the "fast lane" of the highway at night and that the lights of the victim's car were either inoperable or were dimmed. The defendant concludes that these dangerous conditions made the accident unavoidable. The defendant argues that these conditions, therefore, rather than the actions or the intoxication of the defendant, caused the death of the victim.

As stated above, the vehicular homicide statute does not impose criminal liability based solely on the coincidental fact that the fatal accident occurred while the accused was operating a vehicle under the influence of alcohol. *See State v. Ritchie*,

3

590 So.2d 1139 (La.1991) (on rehearing). Also, "[c]ausation is a question of fact which has to be considered in the light of the totality of circumstances surrounding the ultimate harm and its relation to the actor's conduct." *State v. Kalathakis*, 563 So.2d 228, 231 (La.1990). We find, after consideration of the totality of circumstances, that the evidence was insufficient to meet the standard of proof beyond a reasonable doubt that it was the defendant's intoxication, combined with her operation of her car, that caused the victim's death. *See State v. Taylor*, 463 So.2d 1274, 1275 (La.1985).

Four of the trial witnesses saw the accident occur and testified about the positioning and visibility of the victim's car at the time of the accident, and each testified that the victim's car was precariously positioned. Butch Hammett was driving his Ford F-150 in the right-hand lane of the highway at approximately fifty-five to sixty miles per hour in the same direction of travel as the defendant and in front of her car. Mr. Hammett testified as to what he saw:

> Q.     Were you aware of a vehicle coming up behind you?
>
> A.     Well, I was after my wife said there's a vehicle in the left hand lane stopped. And I looked in my rear view mirror just to see if somebody was coming up that lane to hit her.
>
> Q.     And what did you see?
>
> A.     Well, I saw a car approaching my rear, and of course it went in the left lane to pass me and that's when it hit the car that was sitting.
>
> Q.     Now, was this car that was coming up behind you, had it – was it traveling approximately the same speed that you were and pulled out to go around or what did you observe?
>
> A.     Well, no, it had to be going a little faster than I was. Because like I said, I saw it and then I saw it, you know, coming up on me fast enough that it had to change lanes.

4

Mr. Hammett further testified that he did not see the victim's car until the moment of impact:

Q.    Did you – was this vehicle's lights on that was sitting in the left hand lane?

A.    I never saw the vehicle in the left lane.

Q.    Okay, you saw it beside you?

A.    Are you talking about the car that hit the car, or the car that got hit?

Q.    The car that got hit.

A.    No, I never saw the car that got hit until it all was just a big collision.

Mr. Hammett testified that the defendant was driving a Mazda, a car he described as lower to the ground than his Ford F-150.

Dale Vestal testified that he was also driving in the same direction in which the victim's car was facing.  Mr. Vestal described the events as follows:

A.    Yes, sir. Well, I was approaching that Dodge Store area up there, and everybody knows the lights from that thing, and I've always been leery of that, I've seen many wrecks up there. As I approached Ms. Ingram's car, there was some boxes kind of obstructing in the back glass, I couldn't see into the front of the car, automobile. And as I passed the car I told – made the comment to my grandson, I said, that car is fixing to get hit real bad, right there. And I was looking at the automobile and as I passed it Ms. Ingram was in the car, from the side of it, cause I could see the lights from the Dodge Store was shining to me, and I could see through that way. And all I could see is just the bulk of the lady in the car and I told him that car is fixing to get hit and there's somebody in the front seat. And I veered to the right hand side of the road, turned my flashers on, get off the road, because I was with the intentions of going trying to get the car out of the road because I knew somebody was fixing to get hurt real bad. And that's – the moment I stepped out of my truck, I turned and told my grandson, I said, you stay in this truck. And I turned and when I turned that's when the vehicle hit Ms. Ingram from behind.

5

Mr. Vestal also described the lights of the victim's car:

A. . . . The car was there. And I didn't – you know, the thought, I didn't see no tail lights, when I got to her car I could see that the lights had been on, like the battery had run down, maybe shorted out or whatever. They were very dim. And when I got off on the shoulder – on the shoulder of the road, to get out of my vehicle, the lights, her headlights was awful dim on the front, like the battery was going down, maybe the alternator shorted out or whatever, I don't know.

John Dale Loomis, Mr. Vestal's grandson, was riding with him in his truck at the time of the accident. Mr. Loomis described the positioning of the victim's car:

A. . . . When we passed Ms. Ingram's car she was – I guess you can just say sitting out on – I don't really remember – she was kind of sitting over or nothing, she was just sitting there. The lights weren't – they were on, but they weren't bright or nothing. She was just sitting there, I didn't see no movement or nothing.

Mr. Loomis also described the defendant's car immediately prior to the impact:

Q. Did you have time to see it coming down the lane in behind Ms. Ingram?

A. Uh-huh. Right when she came around behind Mr. Butch, I saw her coming straight on into Ms. Ingram's car.

Q. Did she veer right or left?

A. No, from –

Q. Did she throw on her brakes?

A. It was kind of unavoidable, because I mean, I can't really say how fast she was going, I don't really know. But if you're in that situation coming around behind the car, you really didn't have no chance of braking or anything like that. I mean, it was just like that.

Finally, witness Jarred Dooley stated that he saw the victim's car for a brief moment before the impact and that it "straddled the turn lane and the fast lane." Mr. Dooley also stated that it appeared to him that the driver of the victim's car "may have been kind of slumped over somewhat."

6

In *State v. Archer*, 619 So.2d 1071 (La.App. 1 Cir.), *writ denied*, 626 So.2d 1178 (La.1993), the court reversed a conviction following a bench trial for vehicular homicide. The court reversed upon its finding that, under the *Taylor* standard, the evidence that the defendant's intoxication combined with his operation of a vehicle to cause the death of the victim was insufficient. In *Archer*, the intoxicated defendant's van was traveling southbound on a heavily traveled intersection at night. *Id*. The defendant turned left in order to enter the parking lot of a service station located on the northeast corner of the intersection. *Id*. At the scene, the defendant told the investigating officer that at the time he made his left turn, the traffic light controlling traffic at the intersection was showing a green arrow, allowing for traffic to make an unimpeded left-hand turn. *Id*. However, upon turning left, the defendant struck the Toyota Camry in which the victim was a guest passenger, which was traveling north. *Id*. The court reversed the defendant's conviction for the following reasons:

> After carefully reviewing the entirety of the trial testimony and exhibits, we conclude that the state did not sufficiently establish that defendant's unlawful blood alcohol concentration combined with his operation of the van to cause the victim's death. Defendant's statement at the scene that he had a green left turn arrow was neither disproved nor disputed. Although the state presented the testimony of a person who had been in a nearby parking lot and of a driver who was stopped at the intersection before the accident, neither bystander was able to say which driver (defendant or Laird or both) had a green light. At the time of the accident, defendant was turning into the service station and not onto Perkins Road. Thus, he had an obligation to yield to oncoming traffic. However, if the light showed a green turn arrow for defendant to turn onto Perkins, it would be reasonable for defendant (whether sober or intoxicated) to assume oncoming traffic would stop at the red light, thus allowing him to turn safely into the station. We recognize that the state's accident reconstruction expert concluded that defendant took no evasive action prior to the accident. The expert explained that defendant should have turned to the right to go back into the turning lane in order to avoid the accident. However, because defendant already was in the process of turning to the left, his attention would have been focused on the service

7

station and not on any traffic presumably stopped at the light. According to the expert, because it was nighttime and because of the slight incline, defendant would only have seen the glare of the Camry's headlights and would not have been able to estimate the Camry's exact location until the Camry was within two seconds of defendant's location. The expert estimated that the Camry was traveling eighty feet per second. Under these circumstances, the state's position that defendant was at fault for failing to yield to the oncoming vehicle is unreasonable. The hypothesis that the Camry was speeding and ran a red light is "sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt." *Jacobs*, 504 So.2d [817] at 821, n. 6 [(La.1987)].

*Id*. at 1074-75.

In the case *sub judice*, as in *Archer*, the intoxication of the defendant is not contested. Several additional factual circumstances in the case *sub judice* also parallel the circumstances in *Archer*. The accident occurred at night. Although no evidence was adduced at trial to specifically indicate such, the road was described by the state's brief to this court as "congested." The defendant apparently took no evasive action.

Just as the victim's car in *Archer* was positioned so as to cause danger to another driver, evidence in the instant case indicates that the victim's car was also positioned to create a dangerous condition. Mr. Vestal told his grandson that the victim's car was "fixing to get hit real bad." He also stated that the victim's car was in such a dangerous position that he actually pulled over to the side of the road, intending to assist in moving the car from danger. Mr. Loomis, his grandson, stated that because of the location of the victim's car, the accident was unavoidable and that a person in the place of the defendant would have had no opportunity to apply the brakes. Mr. Dooley described the victim's car as straddling the turning lane and the fast lane. Finally, Mr. Hammett testified that he did not see the victim's car even after having been warned by his wife that "there's a vehicle in the left hand lane stopped."

In *Archer*, the court found that the defendant's testimony that the traffic signal gave the right of way to a person making a left turn showed that it was reasonable for the defendant to assume he would not encounter oncoming traffic. The court found that assumption reasonable even though, as pointed out in the *Archer* dissent by Judge Shortess, the defendant was not turning left at the intersection controlled by the light; rather, he was turning left to enter a parking lot situated north of that intersection. *Id.* In the instant case, the defendant could also have reasonably assumed she would not encounter an automobile stopped in the lane of traffic when she attempted to pass Hammett's pick-up truck. Further, although no accident report, diagram or photos showing the accident site were admitted into evidence, no testimony indicated that the defendant was utilizing a lane of the highway that was improper for passing.

Additionally, the expert in *Archer* testified that the defendant would have had problems seeing the victim's car due to the glare of its lights and its speed. *Id.* In the instant case, evidence also suggested that the defendant would have had difficulty seeing the victim's car from her position behind Mr. Hammett's truck. Mr. Hammett observed that the defendant's car was lower to the ground than his pick-up truck. Further, and although the state asserts in its brief to this court that "[a]ll the witnesses were able to clearly see [the victim's] vehicle," Mr. Hammett stated that he "never saw the car that got hit until it all was just a big collision." Additionally, Mr. Vestal and his grandson each testified that the lights of the victim's car were very dim.

In its brief to this court, the state also presupposes that the lack of evasive action on the part of the defendant was due solely to her intoxication. But, the *Archer* court observed that the defendant's movement, the left turn, meant that his attention

9

was focused elsewhere, specifically, on the service station into which he was intending to drive. *Id.* In the instant case, the defendant's attention was likely focused elsewhere, specifically, on Mr. Hammett's pick-up truck, the vehicle she was moving to pass. The *Archer* court found that under the specific facts of the case, the conclusion that the defendant was at fault was unreasonable. *Id.*

Additional jurisprudence supports the defendant's assertion that the circumstances of the accident mean that a rational juror would not have found proof of guilt beyond a reasonable doubt. In *Bordelon v. State, Department of Highways*, 253 So.2d 677 (La.App. 1 Cir.), *writ ref'd*, 260 La. 18, 254 So.2d 619 (1971), the driver-defendant in a suit for civil recovery for the death of his passenger was found to be not liable. The accident occurred at night on a highway and the defendant was driving between sixty and sixty-five miles per hour. *Id.* The defendant diverted his attention momentarily when he changed lanes. When he again looked straight ahead, he saw a dead cow lying in his lane of travel. *Id.* He swerved off the road and into a tree. *Id.* That court quoted *Kirk v. United Gas Public Service Co.*, 185 La. 580, 585-86, 170 So. 1, 3 (1936), where the supreme court stated:

> The rule that a motorist traveling on the public highways after dark or during a rainstorm, fog, or other abnormal condition, which prevents him seeing ahead, except imperfectly, and for a short time and distance, must guard against striking objects in the road with which he may be suddenly confronted, constitutes an exception to the general rule that a motorist may assume that the road is safe for travel even at night. *But that exception to the general rule is itself subject to the exception that a motorist traveling by night is not charged with the duty of guarding against striking an unexpected or unusual obstruction, which he had no reason to anticipate he would encounter on the highway.*

*Bordelon*, 253 So.2d at 678-79 (emphasis added).

The first circuit applied the rule from *Kirk* to a case involving a rear-end collision and stated that an unlighted vehicle, whether moving, stopped or parked

10

upon a highway, constitutes an unexpected or unusual obstruction that would not reasonably be anticipated. *Shively v. Hare*, 189 So.2d 12 (La.App. 1 Cir. 1966).

In contrast to *Bordelon* and *Shively*, this court ruled in *Fontenot v. Continental Casualty Co.*, 175 So.2d 853 (La.App. 3 Cir. 1965), that a driver-defendant was liable to a passenger for injuries occurring from an accident when the driver swerved to avoid an unforeseen obstacle in the road. That driver swerved to avoid a cow standing in his lane of travel. However, the facts of *Fontentot* do not suggest that the defendant was traveling on a busy highway, nor that his attention was reasonably diverted from his path of travel. The accident circumstances in the instant case more closely parallel those circumstances in *Archer* and in *Bordelon*.

Accordingly, we find that the circumstances of the accident precluded the state from proving beyond a reasonable doubt that the intoxication of the defendant combined with her operation of the vehicle to cause Ms. Ingram's death. Rather, the accident was unavoidable, and, under *Taylor*, the defendant may not be held criminally liable simply due to the coincidental fact that the fatal accident occurred while she was driving a vehicle under the influence of alcohol.

Because we find merit in assignment of error number two and reverse the defendant's conviction, the remaining assignments of error need not be addressed.

### DECREE

The defendant's conviction is reversed and set aside. It is ordered that an acquittal be entered on the record.

**CONVICTION REVERSED AND SET ASIDE; APPELLANT ACQUITTED.**

11

NUMBER 04-1571

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

STATE OF LOUISIANA

VERSUS

SHERRY S. BAILEY

AMY, J., dissenting.

I respectfully dissent from the reversal of the defendant's conviction. After review of the record, I find an affirmation required. The State presented testimony indicating that the level of the defendant's intoxication restricts peripheral vision, impairs reaction time, and increases the likelihood of errors in judgment in gauging speed and distances. An eyewitness testified that he was traveling approximately 55-60 miles per hour and that the defendant approached his truck from the rear. The driver explained that the defendant would have had to either slow her speed or change lanes in order to avoid hitting him. The investigating State Trooper testified that there were no skid marks from the defendant driver's vehicle that would indicate an evasive maneuver. Given this testimony, I conclude that the record supports a determination by the jury that the defendant's intoxication contributed to the fatal accident and that, although the evidence as to this element was limited, it was proven beyond a reasonable doubt. The jury members reached their determination regarding contribution of the defendant's intoxicated condition after hearing both the State's witnesses and the contrary expert testimony offered by the defendant. The jury was free to find in favor of the evidence presented by the State.

As I find that the record supports the jury's verdict, I conclude that the conviction should be affirmed.