CRAIN, J.
|2The defendant, James Thomas Watts, was charged by bill of information with vehicular homicide, a violation of Louisiana Revised Statute 14:32.1. He pled not guilty and, following a jury trial, was found guilty as charged. He filed a motion for a new trial, which was denied, and was sentenced to twelve years imprisonment at hard labor, with the first five years to be served without the benefit of parole, probation, or suspension of sentence. The trial court suspended six years of the defendant’s sentence, ordered three years of active, supervised probation upon his release, and imposed a $2,000.00 fine and other special conditions, including completion of a substance abuse program. The defendant now appeals. We affirm his conviction and sentence.
FACTS
The subject accident occurred on September 9, 2011, at approximately 5:20 p.m., at the intersection of Greenwell Springs Road and Will Avenue. Phillip Abington, who was 16 years old, was driving a Honda Civic in an easterly direction on Will Avenue and had stopped at a stop sign where Will Avenue meets Greenwell Springs Road. The speed limit on Greenwell Springs Road at that location is 45 miles per hour. Southbound traffic on Green-well Springs Road was moving slowly and had backed up to Will Avenue. As Abing-ton slowly entered the roadway in an apparent attempt to turn left into the northbound lane of Greenwell Springs Road, his vehicle was struck by a Chevrolet Silvera-do truck being driven by the defendant at a high rate of speed in the northbound lane. The impact propelled the Civic a distance of 122 feet into a ditch, caused severe damage to the vehicle, and fatally injured Abington. When questioned by the investigating state trooper at the scene, the defendant stated that he was driving 55-60 miles per hour and denied any consumption of alcohol. A blood test ^approximately two hours after the accident revealed that he had a blood alcohol content of .09 grams percent, and a crash data recorder in his truck recorded a vehicle speed of 95 miles per hour two seconds prior to the impact.
*444 SUFFICIENCY OF THE EVIDENCE
In his first, fourth, and fifth assignments of error, the defendant challenges the sufficiency of the evidence in support of his conviction. Specifically, he contends that the jury erred in finding that the victim’s death was caused proximately or directly by his actions and that his condition at the time of the accident was a contributing factor to the victim’s death. He also contends that the jury erred in finding that he was under the influence of alcohol at the time of the incident.
A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const, art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, this court must consider “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); see also La.Code Crim. Pro. art. 821 B; State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988). The Jackson standard, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. State v. Petitto, 12-1670 (La.App. 1 Cir. 4/26/13), 116 So.3d 761, 766, writ denied, 13-1183 (La.11/22/13), 126 So.3d 477; State v. Patorno, 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 144.
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. State v. Wright, 98-0601 (La.App. 1 Cir. 2/19/99), 730 So.2d 485, 487, writs denied, 99-0802 (La.10/29/99), 748 So.2d 1157, 00-0895 (La.11/17/00), 773 So.2d 732. When analyzing circumstantial evidence, Louisiana Revised Statute 15:438 provides that, in order to convict, the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. Petitto, 116 So.3d at 766; Patorno, 822 So.2d at 144. The facts then established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Wright, 730 So.2d at 487.
As pertinent to this case, vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, whether or not the offender had the intent to cause death or great bodily harm, when the operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of Louisiana Revised Statute 32:662, or the operator’s blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood. La. R.S. 14:32.1(A)(1), (2).
Under the vehicular homicide statute, the State must prove that an offender’s unlawful blood alcohol concentration combined with his operation of a vehicle to cause the death of a human being. State v. Taylor, 463 So.2d 1274, 1275 (La.1985); State v. Dickinson, 08-0558 (La.App. 1 Cir. 11/3/08), 5 So.3d 179, 183, writs denied, 08-2813, 08-2876 (La.6/5/09), 9 So.3d 870. The evident purpose of the statute is to curb traffic fatalities caused by the consumption of alcohol. It is not aimed at persons involved in vehicular fatalities whose alcohol consumption does not cause, but merely coincides with, such an accident. Taylor, 463 So.2d at 1275; *445 Dickinson, 5 So.3d at 183. In order to convict, the statute should be [¡^construed to require proof of a causal relationship between an operator’s unlawful blood alcohol concentration and the death of the victim. Taylor, 463 So.2d at 1275; Dickinson, 5 So.3d at 183. Causation is a question of fact that should be considered in light of the totality of circumstances surrounding the ultimate harm and its relation to the actor’s conduct. State v. Kalathakis, 563 So.2d 228, 231 (La.1990).
Louisiana State Police Trooper Robert Fontenot investigated the accident and testified that the collision occurred on a clear day with sunshine and very good visibility. There were no abnormalities in the roadway, such as potholes, and the road was clear of debris.
Trooper Fontenot interviewed two witnesses, Darrell Wayne Hayes and Harlan Jerro, both of whom testified at the trial. Hayes, a network technician with Cox Communications, was driving his company vehicle, a large bucket truck, when he witnessed the collision. He was traveling southbound on Greenwell Springs Road and had driven past Will Avenue when traffic came to a complete stop in his lane. He scanned his mirrors and, in his passenger side mirror, saw the Civic pull up to and stop at the stop sign on Will Avenue. The Civic was approximately four-to-five car lengths behind Hayes’ vehicle. Hayes then heard the sound of an engine that was higher pitched than normal and saw a truck approaching him very fast. He looked into his mirror as the truck was passing and saw the front of the Civic pulling out, and the collision occurred. Hayes did not recall seeing brake lights on the truck nor hearing braking sounds in the split second prior to impact. He testified that he did not see any movement by the Civic prior to its pulling out that would indicate that it lurched out or displayed speed in any way. Nothing unusual drew his attention to the Civic.
|fiJerro, an engineering professor at Southern University, was also in the southbound lane on Greenwell Springs Road in slow moving traffic when he noticed a loud truck moving “very, very fast” in the opposite direction. Looking in his rearview mirror, he saw the Civic slowly coming out and then saw the impact. He did not see the Civic lurch forward or spin out, and he saw no unusual movement by the Civic prior to impact.
Trooper Kathryn Slaughter with the Louisiana State Police prepared a scaled drawing of the accident scene. Based on her findings, the final resting place of the Civic was 122 feet from the point of impact, while the Silverado travelled 140.8 feet after the point of impact.
The State offered into evidence a report retrieved from the defendant’s vehicle’s crash data recorder (“CDR”), which records certain information about the vehicle, including its speed, throttle position, and whether the brakes are engaged during the five seconds preceding a collision. According to the information retrieved from the CDR, five seconds before the collision, the defendant was driving 87 miles per hour and his brakes were not active. The defendant increased his speed to 90 miles per hour four seconds prior to the collision with the throttle at 100 percent, increasing to 93 miles per hour three seconds prior to the collision, and 95 miles per hour two seconds prior to the collision with the throttle still at 100 percent. One second prior to the collision, the defendant’s brakes were active, and his speed was reduced to 84 miles per hour.
Regarding the defendant’s level of intoxication, Trooper Fontenot testified that he could smell the odor of alcohol on the defendant’s breath while he spoke with *446 him at the scene of the accident. He also testified that the defendant had red, bloodshot, glossy eyes. Trooper Fontenot ordered Trooper Kevin Biddy to report to Lane Memorial Hospital to have the defendant’s blood drawn. Trooper Biddy |7testified that, upon his arrival at the hospital, he detected a very slight odor of alcohol on the defendant’s breath. The defendant consented to having his blood drawn. At Trooper Biddy’s direction, a registered nurse at the hospital drew the defendant’s blood approximately two hours after the vehicle collision. The samples taken from the defendant at the hospital were tested, and it was determined that his blood alcohol concentration was .09 grams percent.
The defendant cites State v. Archer, 619 So.2d 1071 (La.App. 1 Cir.), writ denied, 626 So.2d 1178 (La.1993), and State v. Bailey, 04-1671 (La.App. 3 Cir. 4/6/05), 905 So.2d 303, writ denied, 05-2057 (La.3/10/06), 925 So.2d 508, in support of his argument that the evidence was insufficient. In Archer, this court reversed a conviction for vehicular homicide, holding that the State failed to sufficiently establish that the defendant’s blood alcohol concentration combined with the operation of his vehicle and resulted in the victim’s death. Archer, 619 So.2d at 1075. We found that the hypothesis that the driver of the other vehicle involved in the accident was speeding and ran a red light was sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. We noted that the defendant’s statement at the scene that he had a green left-turn arrow was neither disproved nor disputed. We also noted testimony from a passenger in the other vehicle that the driver and passengers in the other vehicle had been celebrating the birthday of one of the passengers prior to the accident. The men had purchased a case of beer and stored it in a cooler in the vehicle. They had also been drinking for three to four hours prior to the accident. Additionally, we noted expert opinion that the driver of the other vehicle was driving at least five to ten miles over the speed limit. Archer, 619 So.2d at 1074-75; see also Dickinson, 5 So.3d at 183-84.
|sIn Bailey, the court reversed a conviction for vehicular homicide, holding that the evidence was insufficient to show that the defendant’s intoxication combined with her operation of her vehicle to cause the victim’s death when the defendant struck the victim’s vehicle from the rear while it was stopped in the left-hand lane of a highway. Bailey, 905 So.2d at 304, 310. Based upon the evidence, the court described the victim’s vehicle as “precariously positioned” prior to the collision, which occurred at night, and a witness described the vehicle’s lights as “very dim.” One witness testified that the accident was “kind of unavoidable,” and another stated that the victim’s vehicle “straddled the turn lane and the fast lane” prior to the accident and that its driver “may have been kind of slumped over somewhat.” Bailey, 905 So.2d at 306-07.
We find both Archer and Bailey are distinguishable. In the instant case, the victim was not speeding and had not run a red light as in Archer, nor was his vehicle precariously positioned on a dark highway at night as in Bailey. The subject accident occurred during the daylight hours on a clear day, and the victim came to a stop at the stop sign before slowly proceeding onto Greenwell Springs Road across congested traffic in the southbound lane of the roadway and was attempting to enter the northbound lane when his vehicle was violently struck by the defendant’s truck traveling at a recklessly high rate of speed.
The evidence presented at trial supports the jury’s finding that the defen *447 dant’s inebriated condition caused the wreck resulting in the victim’s death. The State presented evidence from which a reasonable fact finder could determine that the defendant’s judgment was impaired by his blood alcohol concentration and that this caused him to drive at speeds ranging between 84 and 95 miles per hour along a two-lane road with a posted speed limit of 45 miles per hour when traffic in the opposite lane of travel was moving very slowly. Given the defendant’s | flreckless manner of driving, it was reasonable for the jury to infer that his intoxication contributed to his excessive speeding, failure to see the victim’s vehicle, and failure to apply his brakes until one second prior to his impact with the victim’s vehicle. See State v. Trahan, 93-1116 (La.App. 1 Cir. 5/20/94), 637 So.2d 694, 702; State v. Gourdine, 41,469 (La.App. 2 Cir. 12/13/06), 946 So.2d 277, 283-86. We reject the defendant’s argument that the victim’s alleged negligence was a defense in this matter. See State v. Copes, 566 So.2d 652, 656 (La.App. 2 Cir.1990). A victim’s negligence does not negate a finding of criminal negligence on the part of the defendant. See State v. Desoto, 07-1804 (La.3/17/09), 6 So.3d 141, 148.
After a thorough review of the record, we find that the evidence presented in this case, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of vehicular homicide. The jury appears to have accepted the testimony of the State’s witnesses. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. State v. Johnson, 99-0385 (La.App. 1 Cir. 11/5/99), 745 So.2d 217, 223, writ denied, 00-0829 (La.11/13/00), 774 So.2d 971. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder’s determination of guilt. State v. Glynn, 94-0332 (La.App. 1 Cir. 4/7/95), 653 So.2d 1288, 1310, writ denied, 95-1153 (La.10/6/95), 661 So.2d 464.
Additionally, the verdict indicates that the jury rejected the defense theory that the accident was due to the victim’s fault. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. See State v. Captville, 448 So.2d 676, 680 (La.1984); State v. Moten, 510 So.2d 55, 61 (La.App. 1 Cir.), writ denied, 514 So.2d 126 (La.1987). No such hypothesis exists in the instant case. Accordingly, this assignment of error is without merit.
BLOOD COLLECTION KIT
In his second assignment of error, the defendant argues that the trial court erred in ruling that the State proved that an approved blood collection kit was used to draw his blood.
To be considered valid, chemical analy-ses of a person’s blood shall have been performed according to methods approved and promulgated by the Louisiana Department of Public Safety and Corrections and performed by an individual or laboratory possessing a valid permit issued by the Department. See La. R.S. 32:663(A)(1). Louisiana Administrative Code, Title' 55, Part I, § 555 was promulgated in accordance with Louisiana Revised Statute 32:663 and sets forth the rules and procedure for collection of blood for analysis for alcohol content. Specifically, Section 555G provides:
Blood drawn for the purposes of determining the alcoholic content therein shall have been taken with the contents *448 of a sealed “B-D Blood Alcohol Kit” Numbers 4000, 4990 or 4991 (manufactured by Becton-Dickinson division of Beeton-Dickinson and Company), or “NIK Blood Alcohol Kit” Numbers 4000, 4990, 4991 (manufactured by NIK Public Safety, Inc.) or similar blood collection kits as approved. Such kits will be made available to all law enforcement agencies by the Louisiana State Police.
The defendant complains that the kit used to test his blood was not an “NIK Blood Alcohol Kit” or a “B-D Blood Alcohol Kit.” Initially, we note that Section 555G allows the use of “similar blood collection kits as approved.” As pointed out by the trial court, Trooper Biddy used the kit that was issued to him by his employer, the Louisiana State Police. The kit was clearly identified by Trooper Biddy as one that he keeps in his police unit for such instances and, thus, was apparently “made available to” him by the Louisiana State Police. Robert Spinks, |nthe toxicologist who performed the analysis on the defendant’s blood and an employee of the Department, also testified that the kit used in this instance was departmentally approved.[1]
Even if the kit did not fall within the parameters of Section 555G, the test results would still be admissible if the State proved by competent, admissible evidence that the collection device employed provided equivalent protection of the specimen. See State v. Green, 418 So.2d 609, 612-13 (La.1982). In Green, the supreme court recognized that the Department’s rule prescribing the types of blood collection kits to be used merely describes the types of blood collection devices the Department considers reliable for that purpose. Section 32:663 does not prohibit the introduction of test results merely because the collection kit or anticoagulant used differed from that approved by the Department, where competent, admissible evidence proves that the collection device employed provided equivalent protection of the specimen. See Green, 418 So.2d at 612-13.
Trooper Biddy testified that the kit used was one that he kept in his police unit. The kit remains sealed until it is opened in the nurse’s presence and is then given to the nurse. The contents of the kit include two vacuum vials with an anticoagulant inside that works with a hypodermic needle for the test tube, a urine container, a betadine swab, a consent form, and a form for the nurse stating that he or she drew the blood. The defendant’s blood was drawn by Russell Arceneaux, a registered nurse who testified at trial that he follows the same protocol every time when drawing blood at the request of an officer. The blood is always drawn in the presence of the officer, Arceneaux signs the forms, the vials of blood are placed 11?>back into the kit from which they originated, and the kit is sealed. Arceneaux confirmed that he did not deviate from that protocol in this case.
Trooper Biddy testified that seals were placed over the top of the vials of blood, and the vials were placed back into the kit. The part of the kit containing the vials was sealed, and his initials were placed half on the tape used to seal and half on the container. He then transported the kit to Trooper Fontenot at the scene of the collision. Trooper Fontenot delivered the kit to State Police Troop A and admitted it into evidence. The kit was then delivered to the Louisiana State Police Crime Lab.
*449 Spinks, who was accepted without objection as an expert in the field of blood alcohol and toxicology, described in detail the process upon receipt of a kit at the State Police Crime Lab. An evidence technician receives the kit, documents the date and time of receipt, and assigns a number to it. The kit is then placed in a secured, cooled cabinet assigned to a particular analyst, which in this case was Spinks. Spinks obtained the kit from the cabinet the same day it was received at the lab, which was documented when a bar code was scanned when he removed the kit. He broke the seals on the outside box, reviewed and initialed the included forms, and then broke, initialed, dated, and noted the case number on the seals on the “inside” box that contained the tubes of blood. The tubes were also sealed, and he marked the tube when he broke the seals and completed a worksheet. Spinks confirmed that his initials were on the seals in the subject box and that he tested the samples included therein.
Spinks analyzed the blood using a gas chromatograph, and he described that process in detail, including the calibration and daily maintenance of the machine. He ran two tests on the defendant’s sample, and the results for both were within 0.004 of each other, which is within the acceptable range for the analysis. The liaanalysis produced a finding of a blood alcohol content of 0.09 grams per hundred centimeters of blood, and Spinks confirmed that he was confident the result was reliable.
Based upon the evidence presented, the failure of Trooper Biddy to establish that he used either an NIK or B-D Mt does not render the blood alcohol test result inadmissible. The kit that was used was approved by the Department. Furthermore, the State proved by competent, admissible evidence that the collection device employed provided equivalent protection of the defendant’s blood sample. This assignment of error is without merit.
CONSENT TO WITHDRAW BLOOD
In his third assignment of error, the defendant argues that the trial court erred in ruling that he lawfully submitted to a blood alcohol test. Specifically, he contends that, pursuant to Louisiana Revised Statute 32:666, he had the right to refuse to submit to the blood test because Trooper Biddy did not have probable cause to believe that he was operating a motor vehicle under the influence of alcoholic beverages at the time of the accident.
In support of his argument, the defendant relies on Section 32:666 (prior to amendment by 2012 La. Acts, No. 592 § 1), which provided, in pertinent part:
A. (l)(a)(i) When a law enforcement officer has probable cause to believe that a person has violated R.S. 14:98 ... or any other law or ordinance that prohibits operating a vehicle while intoxicated, that person may not refuse to submit to a chemical test ... in any case wherein a fatality has occurred or a person has sustained serious bodily injury in a crash involving a motor vehicle....
(2) In all cases other than those in Paragraph (1) of this Subsection, a person under arrest for a violation of R.S. 14:98 ... or other law or ordinance that prohibits operating a vehicle while intoxicated may refuse to submit to such chemical test....
The defendant contends that the drawing of his blood was improper because Trooper Fontenot did not have probable cause to believe that the defendant was 11 operating his truck under the influence of alcohol. Contrary to the defendant’s assertion, Trooper Fontenot testified that he smelled the odor of alcohol on the defendant’s breath when he spoke with him at the scene of the collision. He described *450 the defendant’s eyes as red, bloodshot, and glossy. Trooper Fontenot also spoke with two witnesses who indicated that the defendant was driving at a high rate of speed when traffic traveling in the opposite direction was moving very slowly. When Trooper Biddy arrived at the hospital approximately two hours after the collision, he detected a slight odor of alcohol on the defendant’s breath. Trooper Biddy also testified that the defendant consented to having a sample of his blood drawn.
Moreover, Louisiana Revised Statute 32:681 A provides that the operator of any motor vehicle that is involved in a collision in which a fatality occurs “shall be deemed to have given consent to, and shall be administered,” a chemical test or tests of his blood, urine, or other bodily substance for the purpose of determining the presence of any abused substance or controlled dangerous substance, as set forth in Louisiana Revised Statute 40:964, or any other impairing substance. The officer authorizing the test' need only have “reasonable grounds to believe the person to have been driving or in actual physical control of a motor vehicle upon the public highways of this state.” See La. R.S. 32:681(B); State v. Weber, 13-1851 (La.5/30/14), 139 So.3d 519, 521 (per curiam). The defendant admitted to Trooper Fontenot that he was driving his truck at the time of the collision. Once Trooper Fontenot determined on the scene that the defendant was the driver of the truck and a fatality had occurred in the accident, he had reasonable grounds to order the defendant’s blood drawn for analysis. See Weber, 139 So.3d at 521-22. Therefore, the defendant, as the operator of the vehicle, was “deemed to have 11Bgiven consent” to the blood test, and the trial court did not err in ruling that he lawfully submitted to the test. This assignment of error is without merit.
EXPERT TESTIMONY
In his last assignment of error, the defendant argues that the trial court erred in its qualification of Trooper Biddy as a CDR specialist because he was not adequately trained and had not previously testified as an expert with regard to the CDR.
Admissibility of expert testimony in Louisiana is governed by Louisiana Code of Evidence article 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of-fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[2]
A trial court is vested with great discretion in determining the competence of an expert witness, and rulings on the qualification of a witness as an expert will not be disturbed unless there was a clear abuse of that discretion. State v. Friday, 10-2309 (La.App. 1 Cir. 6/17/11), 73 So.3d 913, 930, writ denied, 11-1456 (La.4/20/12), 85 So.3d 1258. In this case, the trial court did not abuse its discretion in qualifying Trooper Biddy as an expert in the field of crash data recorder reading. Trooper Biddy testified that he was a designated reconstructionist at State Police Troop A and that he had completed an eight-to-nine week course at a university in Chicago covering accident investigation, accident reconstruction, vehicle dynamics, and the CDR. During the course, he received a computer program that allowed him to download data from the CDR located in the defendant’s truck. Once downloaded, he printed the CDR results. The State *451 offered the results into evidence, and Trooper Biddy testified as to the results.
li (¡Given his qualifications, the trial court did not abuse its vast discretion in qualifying Trooper Biddy as an expert. The fact that this was his first time to testify about the results of a CDR does not prevent him from being qualified as an expert, since every expert witness must have a first time to be recognized as an expert. See State v. Prater, 583 So.2d 520, 523 (La.App. 3 Cir.1991), writ denied, 93-1715 (La.6/17/94), 638 So.2d 1087. This assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.

. By consent of the parties, this testimony from Spinks was offered by the State outside the presence of the jury as part of the eviden-tiary foundation for admission of the results of the blood alcohol test.

. The quoted text of Article 702 is prior to its amendment by 2014 La. Acts, No. 630.