STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2021 KA 0417

STATE OF LOUISIANA

VERSUS

JOHNNY MOORE, JR.

Judgment Rendered: **DEC 2 2 2021**

* * * * *

On Appeal from the
17th Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Trial Court No. 582998

Honorable Christopher J. Boudreaux, Judge Presiding

CHH

* * * * *

Lieu T. Vo Clark
Mandeville, LA

Attorney for Defendant-Appellant,
Johnny Moore, Jr.

Kristine M. Russell
District Attorney
Gregory G. Stahlnecker
Assistant District Attorneys
Thibodaux, LA

Attorneys for Appellee,
State of Louisiana

* * * * *

BEFORE: WHIPPLE, C.J., PENZATO, AND HESTER, JJ.

**HESTER, J.**

A grand jury charged defendant, Johnny Moore, Jr., by bill of indictment with first degree rape, a violation of La. R.S. 14:42. He pled not guilty. After a trial, jurors found defendant guilty as charged. The trial court imposed a sentence of life imprisonment at hard labor, to be served without the benefit of probation, parole, or suspension of sentence. Defendant now appeals. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

In October 2018, F.S.,[1] a seventeen-year-old girl with intellectual and physical disabilities, disclosed to her parents and grandmother that defendant, her uncle, had been raping her. After learning of the abuse, F.S.'s step-father reported it to the police.

Deputy Nicole Doucet of the Lafourche Parish Sheriff's Office was a detective in October 2018 and was assigned to investigate F.S.'s allegations. After speaking with F.S., Deputy Doucet determined a forensic interview of F.S., conducted by the Child Advocacy Center ("CAC"), would be necessary.

The recorded forensic interview was shown to the jury at trial. In the video, F.S. explained that she understood that a lie was something that would get the person saying it in trouble. She had difficulty recalling information like the ages of her brother and cousins or the color of her dog. It appears she understood that if she did not know the answer to something that she could respond as such. She reported that defendant "touched [her] in the wrong area," gesturing towards the area between her legs. Later in the interview, F.S. described this area as her "front." The incidents, which occurred on multiple occasions, first started when she was 16 years old. The first time was in a locked room while she and defendant were alone. Defendant would pick her up and carry her into the bedroom, take her clothes off, put her in the

---

[1] The victim is referred to herein by her initials. See La. R.S. 46:1844(W).

2

bed, take off his pants, and "stick his thing" in her. He also "did it to [her] butt," which would hurt and make her cry. F.S. said she knew it was not right and it was "inappropriate" for her and that he should know better. Defendant would also perform oral sex on her and would ignore her requests to stop. Defendant would get "stuff all over" her legs and in her that "squirted" from his "bird," and he would quickly clean it up. While having sex, he would ask her "odd questions" like if it felt good, and would make moaning sounds because he liked it. F.S. said that urination would be painful after having intercourse, and she "would bleed down there." F.S. believed defendant may have attempted to take naked photos of her with his phone, but said she never saw the photos and that "you'd have to check his phone."

F.S. also stated that defendant expressed his desire to buy her "inappropriate clothes" and "things about sex" off of the internet. Defendant gave her other types of gifts, but F.S. said she threw them away because she did not want to be reminded of him. Defendant told F.S. that she should not tell anyone and keep their secret because they would both go to jail.

F.S. stated she did not remember the abuse until her grandmother brought it up to her. She also did not recall what her grandmother had said to remind her, but that whatever she said triggered her memory of the abuse. F.S. liked watching YouTube videos, but "knew better" than to watch anything inappropriate because her mother would "fuss me."

Following the CAC interview, Deputy Doucet referred F.S. for a physical examination at Children's Hospital. Dr. Paige Culotta, a pediatrician specializing in the field of child abuse, testified that F.S. told her defendant had put his "bird" in "the wrong spot." Dr. Culotta clarified that F.S. pointed to her vaginal area as "the wrong spot." F.S. later disclosed to Dr. Culotta that defendant's "bird" also touched her butt on the inside, and that defendant had ejaculated inside of her. Dr. Culotta

3

testified that she did not see any recent acute injuries to F.S.'s genitals, but that would not be unexpected where the reported abuse happened more than 72 hours prior to the examination. She also observed that intellectually, F.S. "was not a typical 17 year old."

After the forensic exam, Deputy Doucet went to defendant's residence, where she located him, and he voluntarily accompanied her to the criminal operations center for questioning. Before questioning began, Deputy Doucet informed defendant of his **Miranda**[2] rights and he signed an acknowledgement and waiver of those rights. This initial interview was not recorded.

During the questioning, defendant explained to Deputy Doucet that he viewed F.S. as a daughter and that F.S. would often sleep over and spent almost every weekend with him, often in the same bed as him. Defendant informed Deputy Doucet that F.S. was very immature for her age and perceived the world differently than a normal person. After only informing defendant that she was investigating an allegation of molestation of F.S., Deputy Doucet testified that she was thrown off guard when defendant asked if F.S. had been raped. According to Deputy Doucet, defendant stated that he would never touch F.S. and theorized that F.S.'s mother must have discovered that F.S. was having sex with a boyfriend, but was blaming defendant instead.

After Deputy Doucet indicated to defendant that she did not believe that he was being truthful with her, defendant revealed that he believed that F.S. was in love with him and that she had kissed him on the cheek, which made him uncomfortable. He then confessed that on the last occasion he saw F.S., she came into his room, undressed, got on his bed, and waved him over. Defendant told Deputy Doucet he pulled his genitalia out of his pants and proceeded to "touch the tip of his dick" to F.S.'s labia. He explained to the deputy that it was F.S. who initiated the event, and

---

[2] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4

it was up to him to teach F.S. to pleasure herself. Deputy Doucet testified that defendant eventually acknowledged that he had consensual sex with F.S.

After these disclosures, Deputy Doucet decided to Mirandize defendant again and record a second interview with him. The video recording[3] was introduced into evidence and was played for the jury. In it, defendant acknowledged that F.S. is his niece and again explained what he believed led to his being accused of rape. He said F.S. had asked him if she could come to his house, and she was dropped off by her father. When she arrived, F.S. entered his room, hugged him, tried to kiss him, grabbed his leg, and explained that "she didn't have much time." Defendant closed the door, and F.S. climbed onto his bed and removed her clothing. According to defendant, F.S. then waved defendant over, and defendant said he "let inhibitions get ahold of [him]," pulled his shorts down "a little," and intended to have sex with F.S. However, once his "penis touched her," defendant "realized what [he] was doing" and understood that it was wrong, so he "backed away." He admitted that the head of his penis touched "the very beginning of [her] vagina," but he declared that it did not go inside and that there was no penetration. Defendant said the way F.S. was laying on his bed looked "very promiscuous," but the incident was the only time it had been "that extreme." He recounted two prior occasions where he fell asleep in his bed and awoke to find F.S. awake and smiling in his room and his pants and boxers inexplicably around his knees. Defendant also said that he sometimes woke up on the couch with her on top of him, and other times she tried to kiss him. Defendant again expressed his belief that F.S. was in love with him.

Defendant also explained that F.S. came to him with questions about sex and "the urge to release" and "what she could do about it." Defendant explained that he showed her YouTube videos to show her "what she could do to help herself."

_____

[3] While there is a State Exhibit 2 included in the record on appeal, it does not appear to have been separately offered and entered into evidence. Exhibit 2 only consists of the audio from the video interview found in State Exhibit 3.

Defendant said he "took it upon [himself]" to "teach her the correct way" through YouTube videos and instructed her to "find her mom's toys" or "use other things too" like vegetables. According to defendant, F.S. called him three separate times while she was masturbating to ask him questions. He also explained that a "very sexual" friend on the street was teaching F.S. and showing her pornographic videos as well. Defendant said he stopped talking to her as much following those exchanges, but also acknowledged he did not disclose the conversations to anyone else because he did not want her to be punished "for just being curious about her own body." At the conclusion of the recorded interview, defendant apologized for the thing that he almost did and hoped that F.S. could "take something away from this to realize [that] you can't be doing these kinds of things to people."

Ashley Moore, defendant's estranged wife, confirmed that F.S. would often visit her and her husband. Because of her work schedule, defendant would sometimes be alone with F.S. for hours at a time. She also recalled an occasion in 2016 when defendant touched F.S.'s lower stomach, which made F.S. uncomfortable, and F.S. did not come to visit for some time after. Ashley also observed that from October 2017 until F.S. reported the abuse to her family, F.S. was no longer "like herself." She described F.S. as being very affectionate with defendant and would hug him too much and always wanted to be all over defendant or sit on his lap. She also knew F.S. had sent defendant Facebook and text messages.

Dr. Rafael Salcedo, a clinical psychologist specializing in forensic psychology, evaluated F.S.'s level of intellectual functioning. He testified at trial that F.S. has "significant intellectual limitations" and presented to him as very childlike, immature, and innocent. In his evaluation, Dr. Salcedo learned that F.S. suffered from intractable epileptic seizures throughout her life. He also noted that F.S. went to high school and had accommodations made for her intellectual disability. After administering formal intellectual testing on F.S., Dr. Salcedo

6

determined F.S. had a Wechsler full scale IQ of 50 (falling within the mild to moderate range of intellectual disability), and a Vineland Adaptive Behavior Scale overall composite score of 31 out of 100. Dr. Salcedo's evaluation of F.S. revealed that she was intellectually disabled, and he opined that F.S. had a severe and chronic developmental disability. Further, Dr. Salcedo concluded that F.S. was "incredibly naïve," and "just says what's on her mind with very little [i]n the way of [c]ensoring or manipulation…."

F.S. was 18 years old and in the eleventh grade at the time she testified at trial. She said that defendant put his "bird" in her "private part" on more than one occasion and that he used his mouth to touch parts of her body. F.S. explained that defendant would remove her clothes and touch her, that defendant "would say that he would want to get [her] pregnant," and that "warm stuff" would come out of his "bird" that could "get a girl pregnant[.]" She acknowledged that she once had a Facebook account and would have online conversations with defendant. During cross-examination, F.S. identified a photo of herself that she had sent defendant some time previously on Facebook but did not recall sending the picture. F.S. also recognized a voice message she left for defendant on August 15, 2018 in which she asked him to come get her, but she did not remember leaving the message.

F.S. explained that she had not remembered the abuse until October 2018 when her grandmother said something about defendant raping her. At the time, F.S. had forgotten that she made a prior disclosure to her grandmother, but, at trial, she recalled previously asking her grandmother "to come help me and save me." However, it was the October 2018 conversation with her grandmother that prompted F.S. to tell her parents what had been happening. F.S. clarified that her seizures made her "forget a lot" and that she "can't remember everything because of [her] epilepsy." F.S. also explained that she did not report the abuse sooner because defendant had told her that she would go to jail with him if she did.

7

## ASSIGNMENTS OF ERROR 1, 2, AND 3: INSUFFICIENT EVIDENCE

In three assignments of error, defendant contends the evidence was insufficient to show defendant's guilt beyond a reasonable doubt. Defendant asserts that the victim's testimony was unreliable and that the physical examination did not corroborate her allegations. Defendant alleges that F.S. admitted that "she did not remember anything until she had the conversation with her grandmother who brought up that [defendant] had raped [her.]" In sum, defendant argues on appeal his admission that he touched his penis to F.S.'s labia does not establish the necessary element of penetration; therefore, the State did not prove beyond a reasonable doubt that he committed rape. While defense counsel claimed the State failed to provide any evidence that F.S. was unable to resist due to her mental or physical infirmities at trial, defendant does not contest that F.S. was unable to resist due to physical or mental infirmity on appeal.

The State claims the evidence presented at trial was sufficient to sustain the conviction. The State highlights the victim's testimony that defendant penetrated her vagina, as well as defendant's unrecorded statements to Deputy Doucet in which "he acknowledged penetrating the victim."

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); see also La. Code Crim. P. art. 821(B); **State v. Mussall**, 523 So.2d 1305, 1308-09 (La. 1988). The **Jackson** standard, incorporated

8

in Article 821,[4] is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Watts**, 2014-0429 (La. App. 1st Cir. 11/21/14), 168 So.3d 441, 444, writ denied, 2015-0146 (La. 11/20/15), 180 So.3d 315.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness, including that of experts. **State v. Armentor**, 2019-1267 (La. App. 1st Cir. 7/31/20), 309 So.3d 762, 767, writ denied, 2020-01032 (La. 2/17/21), 310 So.3d 1149. Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the trier of fact, is sufficient to support a factual conclusion. **State v. Moultrie**, 2014-1535 (La. App. 1st Cir. 12/14/17), 234 So.3d 142, 146, writ denied, 2018-0134 (La. 12/3/18), 257 So.3d 1252. Moreover, when there is conflicting witness testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. **State v. Logan**, 2019-0590 (La. App. 1st Cir. 7/20/20), 2020 WL 4048059, *3 (unpublished). An appellate court will not re-weigh evidence to overturn a factfinder's determination of guilt. **State v. Galan**, 2018-1481 (La. App. 1st Cir. 5/14/19), 277 So.3d 365, 369, writ denied, 2019-01027 (La. 1/22/20), 291 So.3d 1042.

---

[4] Louisiana Code of Criminal Procedure article 821 provides, in pertinent part, as follows:

A. The defendant may move for a post verdict judgment of acquittal following the verdict. A motion for a post verdict judgment of acquittal must be made and disposed of before sentence.

B. A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.

C. If the court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.

Rape is "the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent." La. R.S. 14:41(A). "Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La. R.S. 14:41(B). Louisiana Revised Statute 14:42 provides in pertinent parts:

> A. First degree rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
> * * *
>
> (6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.
> * * *
>
> C. For purposes of this Section, the following words have the following meanings:
> (1) "Physical infirmity" means a person who is a quadriplegic or paraplegic.
> (2) "Mental infirmity" means a person with an intelligence quotient of seventy or lower.

As an initial matter, as noted above, defendant does not argue here that F.S. did not suffer from an intellectual disability. Moreover, the State produced ample testimony, both forensic and anecdotal, regarding F.S.'s intellectual disabilities and "childlike" manner. In short, the evidence established that F.S. was prevented from resisting defendant due to her intellectual disability.

On appeal, defendant disputes F.S.'s credibility where she demonstrated difficulty remembering in her forensic interview and trial testimony and because F.S. did not "remember" the rape until her grandmother reminded her. Defendant also claims the physical evidence does not corroborate F.S.'s account. However, Deputy Doucet credibly testified that defendant admitted to having penetrative vaginal sex with F.S., and F.S. testified consistently that defendant raped her on multiple occasions. It is apparent the jury also found credible the explanation that F.S.'s grandmother was referring to F.S.'s prior disclosure of the rape that F.S. had

10

forgotten due to her physical and mental limitations. Importantly, the expert and lay witnesses who testified about F.S. indicated she appeared incapable of deception and abstract thought. The jury further viewed the CAC interview video in which F.S. presented consistently with the other testimony given about her affect and capabilities. Dr. Culotta explained that given the span of time between the incident and the reporting, it was not unusual to find a lack of physical trauma on F.S. Moreover, defendant's recorded statement indicated an ongoing, highly inappropriate relationship with F.S. that, according to defendant, culminated in his intent and attempt to put his penis inside her vagina.

After a thorough review of the record, we find that the evidence supports the guilty verdict. Presented with defendant's explanation of his inappropriate behavior with F.S., the jury made a credibility determination and rejected defendant's hypothesis that his sexual contact with F.S. was not penetrative. The jury was not unreasonable in finding unpersuasive defendant's attempts in the recorded interview to minimize his wronging and blaming a 17-year-old, intellectually disabled F.S. for "doing these kinds of things to people." Moreover, it is apparent that the jury found the testimony of the witnesses to be credible. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that defendant was guilty of first degree rape. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

**CONVICTION AND SENTENCE AFFIRMED.**